HLS

EXECUTION COPY

# PURCHASE AND SALE AGREEMENT

for the

SEABROOK NUCLEAR POWER STATION

by and among

NORTH ATLANTIC ENERGY CORPORATION,

THE UNITED ILLUMINATING COMPANY,

GREAT BAY POWER CORPORATION,

NEW ENGLAND POWER COMPANY,

THE CONNECTICUT LIGHT AND POWER COMPANY,

CANAL ELECTRIC COMPANY,

LITTLE BAY POWER CORPORATION,

and

NEW HAMPSHIRE ELECTRIC COOPERATIVE, INC.

as Sellers

and

NORTH ATLANTIC ENERGY SERVICE CORPORATION

and

FPL ENERGY SEABROOK, LLC

as Buyer

dated

April 13, 2002

HCG

2. *Acquisition of Assets by Buyer.*

2.1. *Purchase and Sale of Assets*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement at the Initial Closing and each Subsequent Closing, each of the Required Sellers or the Remaining Sellers, as the case may be, shall sell, assign, convey, transfer and deliver or cause to be sold, assigned, conveyed, transferred and delivered to the Buyer, and the Buyer shall purchase, assume and acquire, free and clear of any Lien (except for Permitted Encumbrances), Sellers' Ownership Shares in the properties and assets to the extent constituting, or to the extent used in the operation of, the Facility, including but not limited to the following (the "*Acquired Assets*"):

(a) (i) the real property which is owned solely by NAEC, easements and other rights in real property as described in Schedule 2.1(a)(i) and all rights arising out of the ownership thereof or appurtenant thereto, including, without limitation, all related rights of ingress and egress (the "*NAEC Real Property*"), subject to the Permitted Encumbrances, including the matters set forth in Schedule 2.1(a)(iii)(A), and (ii) the real property (other than the NAEC Real Property), Improvements thereon and Improvements on the NAEC Real Property, easements and other rights in real property described in Schedule 2.1(a)(ii), and all rights arising out of the ownership thereof or appurtenant thereto, including, without limitation, all related rights of ingress and egress (the "*Jointly Owned Real Property*"), subject to the Permitted Encumbrances, including the matters set forth in Schedule 2.1(a)(iii)(B) (the NAEC Real Property and the Jointly Owned Real Property are referred to together as the "*Real Property*");

(b) all Nuclear Materials, Spent Nuclear Fuel and other High Level Waste to which the Sellers have title on the Initial Closing Date and each Subsequent Closing Date, all of which are identified on Schedule 2.1(b) (which shall be updated as of the Initial Closing Date and each Subsequent Closing Date) and all Low Level Waste, including without limitation, those items which are identified by type and amount on Schedule 2.1(b) (which shall be updated as of the Initial Closing Date and each Subsequent Closing Date);

(c) all machinery, mobile or otherwise, equipment, computer hardware and software, communications equipment, tools, spare parts, fixtures, furniture, furnishings, and other personal property owned by the Sellers and which is principally used in or principally relates to the operation or maintenance of the Facility, and the Inventories owned by the Sellers which are held at or are in transit from or to the Site, including, without limitation, the items of personal property set forth in Schedule 2.1(c), as well as all applicable warranties and guaranties existing as of such Closing Date from Third Parties relating thereto to the extent such warranties and guaranties are transferable to the Buyer, or to the extent any such items are leased, an assignment of the applicable leases for such items (as well as all applicable warranties and guaranties existing as of such Closing Date from Third Parties relating thereto to the extent transferable to the Buyer);

HL7

(d) all assets associated with Seabrook Unit 2, including without limitation, the structures, equipment, components and parts, wherever located, that were purchased for Unit 2 and not sold, transferred or disposed of prior to the Initial Closing, to the extent owned by the Sellers as set forth in Schedule 2.1(d) (*"Unit 2"*);

(e) all of the Sellers' rights with respect to leasehold interests and subleases and rights thereunder to the extent relating to the Real Property, including, without limitation, with respect to the leases or Leased Property, those items which are set forth in Schedule 2.1(e) (the "*Leases*");

(f) all Permits, which, as of such Closing Date, are transferable by the Sellers to the Buyer by assignment or otherwise (including, without limitation, upon request or application to a Governmental Authority, or which will pass to the Buyer as successor in title to the Acquired Assets by operation of Law), including, without limitation, those Permits set forth in Schedule 2.1(f) (the *"Transferable Permits"*);

(g) except as specifically provided in Section 2.2(h), all rights of the Sellers under the contracts, agreements, purchase orders, the Joint Ownership Agreement, the Disbursing Agent Agreement, the DOE Standard Contract (including all rights to any claims of Sellers related to DOE defaults thereunder), the Nuclear Fuel Contracts, the Transmission Support Agreement, the Memorandum of Understanding with the Town of Seabrook, and personal property leases to the extent relating to the operation of the Facility set forth in Schedule 2.1(g) and, to the extent transferable to the Buyer, all warranties and guaranties existing as of such Closing Date from Third Parties relating to the Acquired Assets (the "*Material Contracts*");

(h) to the extent permitted by applicable Law, and as promptly as practicable after such Closing and at such locations and in such form (hard copy, magnetic or electronic) as shall be agreed upon, all documents, correspondence, books, records, medical records, operating, safety and maintenance manuals, inspection reports, drawings, models, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports, quality assurance records, purchasing records and equipment repair data, safety, maintenance or service records relating to the design, construction, licensing, regulation, operation or Decommissioning of the Facility and the other Acquired Assets, wherever located, including, without limitation, all drawings, designs, specifications and other documents owned by a Third Party and licensed to Sellers which are used in or necessary to the licensing, operation or Decommissioning of the Facility;

(i) to the extent permitted by applicable Law, all Acquired Assets Employee Records;

(j) all rights of the Sellers in and to the words "*Seabrook Station*" and any related or similar trade name, trademark, service mark, copyright, corporate name, logo or any part, derivative or combination;

(k) all assignable right, title and interest of the Sellers to the NRC Licenses;

(l) all right, title and interest of the Sellers on the Initial Closing Date and each Subsequent Closing Date in Nuclear Fuel wherever located, as described on Schedule 2.1(l) (which shall be updated as of the Initial Closing Date and each Subsequent Closing Date);

(m) all of the Sellers' right, title and interest in the assets comprising the Decommissioning Funds as of such Closing Date, including, without limitation, those items identified on Schedule 2.1(m), including all income, interest and earnings accrued thereon, together with all related tax accounting and other records;

(n) without limiting the generality of Sections 2.1(a) and 2.1(c), all rights of the Sellers in the property and assets used or usable in providing emergency warning or associated with emergency preparedness as set forth in Schedule 2.1(n)(i) (the "*Emergency Preparedness Assets*") and all rights of the Sellers under the contracts and agreements associated with such emergency preparedness as set forth in Schedule 2.1(n)(ii) (the "*Emergency Preparedness Agreements*");

(o) all right, title and interest of the Sellers in the vehicles set forth in Schedule 2.1(o) (the "*Vehicles*");

(p) all assignable rights, benefits and interest of the Sellers as of such Closing Date under purchase orders, licenses or contracts that are not Emergency Preparedness Agreements, Material Contracts, Intellectual Property Licenses or Leases but that (i) relate to the operation of the Facility, (ii) are identified in writing by the Parties between the Effective Date and such Closing Date, and (iii) are set forth in a schedule to be attached to the Assignment and Assumption Agreement at such Closing (the "*Other Assigned Contracts*");

(q) all Owned Intellectual Property; provided that the Buyer shall grant to the Sellers an irrevocable, perpetual and fully paid-up license for the Sellers and their agents to use, copy, modify and create derivative works based upon and grant sublicenses to their Affiliates to such Owned Intellectual Property in connection with the operation of Sellers' and their Affiliates' business and the electric power generation stations or plants operated by the Sellers and their Affiliates; provided, further, that each Party shall have no obligation after the relevant Closing Date to provide the other Parties with any updates, maintenance or technical support with respect to such Intellectual Property;

(r) to the extent transferable, all Nuclear Insurance Policies set forth in Schedule 2.1(r) and the rights to proceeds from insurance policies for coverage of Acquired Assets and Assumed Liabilities, including all rights to collect premium refunds made on or after the relevant Closing Date pursuant to the ANI nuclear industry credit rating plan (other than refunds that relate to premiums paid prior to such Closing Date);

(s) all contracts, instruments or other agreements set forth in Schedule 2.1(s) relating to the sale by the Sellers of electric capacity, energy or ancillary products or services from the Facility under wholesale rates or otherwise subject to regulation by the FERC;

(t) the Sellers' claims, rights or causes of action against any Third Parties to the extent arising out of or relating to Sellers' right, title and interest in and to any of the Acquired Assets or the Assumed Liabilities or any portion thereof, whether received as a payment or credit against future liabilities, including, without limitation, insurance proceeds, condemnation awards and cash payments under warranties covering the Acquired Assets to the extent such payments relate to Assumed Liabilities or the Acquired Assets;

(u) the Sellers' interests in the escrow account established in accordance with the Memorandum of Understanding with the Town of Seabrook;

(v) all other assets of the Sellers to the extent constituting, or used or held for use in the operation of, the Facility, as set forth on Schedule 2.1(v), as amended by the Parties pursuant to Section 5.6 (the "*Other Related Assets*");

(w) all emission reduction credits owned by the Sellers that relate to the operation of the Facility, as set forth in Schedule 2.1(w);

(x) an assignment of all Intellectual Property Licenses, as set forth in Schedule 2.1(x), including any related maintenance agreements for Licensed Intellectual Property, to the extent assignable to the Buyer on commercially reasonable terms, as described in Section 5.2(b)(iv);

(y) the property comprising or constituting the 345 kV Substation located at the Site (notwithstanding how such properties are treated for regulatory or accounting purposes and whether such assets are real or personal property) as set forth in Schedule 2.1(y) and as shown in the drawing referenced therein, as well as all Permits and contracts that relate to the 345 kV Substation;

(z) with respect to the portion of UI's Ownership Share which consists of a leasehold interest in the Undivided Interest, UI agrees to exercise its rights under Section 14(a) and (b) of the Facility Lease and the Termination Agreement to cause the Facility Lease to be

HLS

part, prior to the Initial Closing Date, the Sellers shall cooperate and provide the Buyer with any information in their possession that will assist the Buyer in locating any Third Party who may be a "potentially responsible party" as defined by any Environmental Laws with respect thereto, and, prior to the second anniversary of the Initial Closing, the Sellers shall not waive or excuse the liability of any Third Party who may share responsibility for any of such Environmental Liabilities that would be likely to have a Plant Material Adverse Effect.

5.15. *Control of Litigation*. The Parties agree and acknowledge that the Seller Representatives shall, subject to the Joint Ownership Agreement and the Managing Agent Operating Agreement, be entitled exclusively to control, defend and settle any litigation, administrative or regulatory proceeding, and any investigative or Remediation activities (including without limitation any environmental mitigation) arising out of or related to any Excluded Assets or Excluded Liabilities, so long as such defense, settlement or other activities do not unreasonably interfere with the Buyer's operation of the Facility or materially impair the value of the Facility, and the Buyer agrees to use Commercially Reasonably Efforts to cooperate with the Seller Representatives in connection therewith. The Parties agree and acknowledge that the Buyer shall be entitled exclusively to control, defend and settle any litigation, administrative or regulatory proceeding, and any investigative or remediation activities arising out of or related to any Acquired Assets or Assumed Liabilities, so long as such defense, settlement or other activities do not unreasonably interfere with the Sellers' respective businesses, and the Seller Representatives agree to use Commercially Reasonably Efforts to cooperate with the Buyer in connection therewith.

5.16. *Availability of Funds*. On or before the Effective Date, the Buyer shall have delivered to the Sellers (a) evidence of sufficient funds available to it as of the Initial Closing Date through the last Subsequent Closing Date or binding written commitments from responsible financial institutions to provide sufficient immediately available funds as of the Initial Closing Date through the last Subsequent Closing Date to pay the Facility Purchase Price, the Fuel Purchase Price, the Unit 2 Purchase Price, the NAEC Real Property Purchase Price and any Estimated Adjustment and (b) evidence of the availability of the Acceptable Guaranty in accordance with Section 2.5.

5.17. *Department of Energy Decontamination and Decommissioning Fees*. Each Seller shall continue to pay its Ownership Share of all uranium-enrichment decontamination and decommissioning fund fees levied by the DOE pursuant to 42 U.S.C. Section 2297g-1 that are payable prior to the Initial Closing Date or any Subsequent Closing Date, as the case may be. On and after the Initial Closing and each Subsequent Closing Date, the Buyer shall pay such decontamination and decommissioning fund fees for the appropriate Ownership Shares acquired by the Buyer at each Closing, including but not limited to all annual special assessment invoices issued on and after the Initial Closing Date by the DOE, as contemplated by its regulations at 10 C.F.R. Part 766 implementing Sections 1801, 1802, and 1803 of the Atomic Energy Act.

5.18. *Cooperation Relating to Insurance and Price-Anderson Act*. Until the Initial Closing, the Sellers shall maintain in effect not less than the amounts of property damage and

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

FPL ENERGY SEABROOK, LLC

By: [signature]
Name: J.A. Stall
Title: Vice President

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

CANAL ELECTRIC COMPANY

By: ______________________

Name: Douglas S. Horan

Title: Sr. Vice President, Clerk and General Counsel